THOMAS,
Specially Concurring.
I concur in the court’s opinion. I write to express my view that even if the trial court erred by excluding the State’s Notice To Revoke Junior’s Plea Agreement, the error was harmless. See Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that cross examination errors are subject to harmless error analysis).
The Florida Supreme Court has held that:
The solemn obligation of the Court to perform an independent harmless error review and establish the analysis to be applied in performing that review is so critical to the appellate function that this Court has satisfied its obligation to review for harmless error, even when the State has not argued that the complained of ■ error was harmless. See Heuss v. State, 687 So.2d 823 (Fla.1996). We concluded in that case that regardless of any lack of argument on the issue by the state, [t]he court must still be able to conclude beyond a reasonable doubt, after evaluation of the impact of the error in light of the overall strength of the case and the defenses asserted, that the verdict could not have been affected by the error.
Goodwin v. State, 751 So.2d 537, 545 (Fla.1999) (emphasis in original). Here, the State did assert harmless error, although its rationale differs from this concurring opinion. In viewing the overall strength of the State’s case, the defenses asserted, Appellant’s obvious interest in excluding the entire context of the evidence at issue, and the record as a whole, I believe that any purported error was harmless, as defined by the Florida Supreme Court. Several significant factors support this determination.

Appellant’s Attempt to Exclude Trial Court Ruling On Junior’s Plea Agreement

The most significant fact that any error was harmless was Appellant’s attempt to exclude the trial court’s ruling that Willie Junior had complied with the plea agreement. Appellant filed a motion in limine to keep the jury from learning that the trial court found that Junior had complied with his obligations under his plea agreement.
*102 The trial court stated that if the State’s Notice to Revoke was admitted, then the trial court’s ruling denying the revocation would be admitted into evidence. The trial court’s ruling would have been legally correct. See Tompkins v. State, 502 So.2d 415 (Fla.1986) (holding that defense counsel opened the door to the State’s redirect questions establishing that the murder victim had begged her mother to stay out of relationship with the defendant); Wright v. State, 582 So.2d 774 (Fla. 2d DCA 1991) (holding that defense counsel on cross examination opened the door to allow the State on redirect examination to introduce statements of accomplice inculpating defendant). Cf. Pacheco v. State, 698 So.2d 593, 595 (Fla. 2d DCA 1997) (holding that the trial court erred in allowing the State on redirect examination to introduce co-defendant’s statements against defendant where defense only opened the door to testimony that co-defendant had led police to suspect defendant). Under the doctrine of completeness, the jury would have heard that the trial court found Junior’s changed story was not a violation of Junior’s obligation to testify truthfully.
If the trial court had allowed Appellant to cross examine Junior regarding the State’s Notice to Revoke Junior’s plea agreement, then Junior’s testimony on redirect examination explaining that the trial court found Junior in compliance with the plea agreement would be admissible. The admission of this testimony would have harmed Appellant’s defense. This explains why Appellant’s attorney wisely attempted to exclude the ruling.
Appellant wanted the jury to hear only that the State attempted to revoke Junior’s plea agreement, not that the trial court denied the State’s attempt. Thus, any error in excluding the State’s unsuccessful attempt to revoke Junior’s plea agreement was harmless beyond a reasonable doubt when viewed in the context of the trial court’s ruling that Junior had not violated the agreement.

Evidence of Guilt and Cross Examination of Junior

An additional persuasive factor supporting a harmless error finding is the substantial record evidence of Appellant’s guilt. See Larkins v. State, 655 So.2d 95, 99 (Fla.1995) (holding that when viewed in the context of the overwhelming evidence of guilt and the “questionable weight” of the excluded cross examination evidence, the trial court’s error in limiting defendant’s impeachment of witnesses was harmless). See also, Davis v. State, 711 So.2d 1314 (Fla. 2d DCA 1998) (holding that because there was strong evidence of defendant’s guilt, the trial court’s error in granting the State’s motion in limine preventing the cross examination of victim regarding pending charges was harmless). The State’s case against Appellant must be considered in relation to another factor supporting a harmless error finding, which is Appellant’s cross examination of Junior.
Appellant cross examined Junior extensively regarding his plea agreement with the State. This is not a case where a defendant was unable to present a defense due to a trial court ruling excluding impeachment of a key witness. The Florida Supreme Court stated that an error limiting cross examination could be held harmless when reviewed in the proper context:
In Delaware v. Van Arsdall, ... the Court held that curtailing or denying cross examination could be harmless error if certain criteria are met. Those criteria include the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination *103 otherwise permitted, and, of course, the overall strength of the prosecution’s case.
Livingston v. State, 565 So.2d 1288, 1291 (Fla.1988) (citations omitted).
In this case, the purported error in limiting cross examination was harmless, as established in part by extensive circumstantial evidence buttressing Junior’s direct testimony. The record established that any evidence regarding the State’s attempt to revoke Junior’s plea agreement would have been generally cumulative. Defense counsel presented exhaustive testimony concerning Junior’s inconsistent statements, his pending charges, his motivation to please the State to avoid criminal prosecution, and his financial distress. The record demonstrates that any marginal evidentiary value Appellant lost by his inability to raise the State’s unsuccessful attempt to revoke Junior’s plea agreement did not affect the verdict. Appellant’s extensive and vigorous defense, including his successful defense against the money laundering charge, demonstrated that Appellant was sufficiently allowed to assert his theory of the case.
In contrast to Appellant’s cross examination of Willie Junior, there was record evidence corroborating Junior’s testimony, both in significant and minor details. For example, Junior testified that he received a pot of money from Appellant; there was testimony that Appellant had pots and pans in his office, including a pot somewhat similar in size to the pot introduced by the State. Additional evidence established that Junior had use of extensive cash; a witness observed Junior paying a debt from a 3/4-inch to 1-inch thick bankroll around the time of the alleged bribe. Additionally, Junior purchased a floor safe around the time of the alleged bribe.
Other evidence established that the land purchase was not a legitimate and normal county commission action, as Junior implicitly and explicitly claimed. The Director of Administrative Services for Es-cambia County testified that the purchase of the soccer complex required changes in other county projects to provide the funds for the purchase. Several priority projects were delayed, including a road prison and courthouse renovations.
Despite the above issues, the land purchase was closed and resulted in a net proceed to Elliot Properties of $561,931.80, and Appellant played a significant role in the purchase. Evidence established that Appellant, as county commission chairman, made a motion at the county’s November 1, 2001, meeting to “add on” the item proposing the purchase of the soccer complex. The commission had previously rejected the purchase before Appellant’s election in 2000.
Other circumstantial evidence demonstrated that Appellant, Willie Junior, and Joe Elliot were working together very closely to ensure the final purchase of this property. State Attorney Investigator Allan Cotton established that numerous telephone calls were made between Appellant, Junior, and Mr. Elliot. On February 3, 2002, the day a newspaper story was published about the purchase of the soccer complex, Appellant called Junior and Mr. Elliot before 5:00 a.m. Although Investigator Cotton acknowledged on cross examination that there was no evidence that Junior returned Appellant’s telephone call or that they talked that day, the number of telephone calls between Appellant, Junior, and Elliot demonstrated that the three were talking quite often while the property purchase was proposed and completed.
Other evidence corroborated Junior’s testimony that the money received from Appellant was not a loan. Testimony established that Appellant failed to ensure that the alleged loan from Junior would be *104 collectable, despite Appellant’s extensive familiarity with the proper legal procedures.

Appellant’s Defense

In addition to the evidence corroborating Junior’s testimony that he and Appellant received payment for their votes, Appellant presented evidence which,' at least in part, corroborated Junior’s testimony and the State’s case. Most significantly, Appellant acknowledged that he gave Junior large sums of money for what Appellant claimed were loans.
Appellant testified he loaned Junior $10,000 on May 31, 2001, with the expectation of repayment with interest. Appellant made further loans to Junior with the understanding that the money would either be repaid or Appellant would obtain Junior’s funeral home. On December 5, 2001, Appellant loaned Junior $40,000. On February 16, 2002, Appellant and Junior executed a note which stated “replace prior notes.” Appellant denied ever giving Junior cash.
A later agreement was signed by Appellant and Junior on December 28, 2001, covering all previous loans, in which Appellant would either receive Junior’s funeral home or the right to sell the property if the loans remained unpaid. Appellant testified that he expected to make a profit from obtaining Junior’s funeral home. Appellant acknowledged entering another agreement on February 16, 2002, in which Junior agreed he owed Appellant $81,000, and if repayment was not made, Appellant would be entitled to Junior’s funeral home property. Appellant acknowledged that earlier agreements had been lost.
Appellant loaned Junior another $9,000 and helped Junior obtain an attorney regarding apparently unrelated federal issues. When Junior exhibited unusual behavior, Appellant testified he was not going to loan him more money.
On February 25, 2002, after the investigation became public, Junior and his wife acknowledged in writing that Appellant could act as an agent to sell the funeral home. Appellant acknowledged that a mortgage was filed against Junior’s funeral home by another party on April 10, 2002, and that this would make collection of the debt more difficult.
Appellant acknowledged calling Junior and Mr. Elliot before 5:00 a.m. on February 2, 2002, the day the newspaper article appeared casting suspicion on the soccer complex purchase. Appellant testified that he read the newspaper early that morning and wanted to know if there was any truth to the allegations. He testified that he knew he did not take any money, and thus wanted to question Junior and Elliot. Appellant denied any criminal acts.
On cross examination, Appellant admitted that he filed or had filed on his behalf more than 600 real estate transactions in Escambia County. Appellant acknowledged that he knew a mortgage deed must be filed to ensure the ability to foreclose on property serving as security on a note. Appellant was repeatedly questioned by the State to clarify why he took no action to protect his right to Junior’s property, which allegedly served as security, in light of Appellant’s practice of protecting his interest in other loans. Appellant acknowledged that he knew there was a problem on February 25, 2002, when Junior acted strangely. However, Appellant did not seek to pay documentary stamps or make a Uniform Commercial Code filing, even on June 2, 2002, when Junior’s note was past due.
Appellant acknowledged that he knew Junior was “beyond desperate” and having financial difficulties when he loaned Junior $10,000 on May 31, 2001, which was due and payable in six months at eight percent *105 interest. Yet on December 5, 2001, after Junior failed to repay any of this $10,000 debt, Appellant loaned Junior another $40,000, and did not secure his interest on this loan. Appellant stated that he told many people that he loaned Junior the $40,000, including the Pensacola News Journal.
Appellant acknowledged the telephone records showing extensive contacts with Junior. He indicated that he only attempted to contact Junior seven times between January and June 2001, but attempted to contact Junior hundreds of time from June 2001 through February 8, 2002. He testified that he did not talk about county business during those contacts. Appellant acknowledged that without Junior’s vote, Joe Elliot, described by the State as Appellant’s “30-year friend,” would not have made approximately $561,000 from the county’s purchase of the soccer complex.

Conclusion

As shown by the above summary, the jury heard extensive evidence of Appellant’s guilt and a vigorous defense asserted by Appellant. In my view, there is no reasonable possibility that the trial court’s exclusion of the evidence affected the verdict, when the error is viewed in light of the doctrine of completeness and in light of the record as a whole. See Cardenas v. State, 867 So.2d 384 (Fla.2004) (holding that harmless error analysis requires appellate courts to determine that there is no reasonable possibility that error affected the verdict). See, e.g., Williamson v. State, 894 So.2d 996, 999 (Fla. 5th DCA 2005) (“For the harmless error rule to apply, the State must prove there is no reasonable possibility the error contributed to the defendant’s conviction.... After a review of the testimony, documentary and physical evidence, and expert opinions offered in this case, we are convinced that the State demonstrated that the error was harmless beyond a reasonable doubt.”) (citations omitted). Appellant aggressively cross examined Junior. In addition, the excluded information would have added very little to what the jury already knew about Junior. Finally, as the State urged in its closing argument, the jury obviously discounted Junior’s motive to lie for a more lenient sentence in light of the corroborating evidence of guilt.
Accordingly, I would affirm on the additional basis that the trial court’s ruling, if error, was harmless beyond a reasonable doubt.