**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 98-4320

ERIC MICHAEL TURNER, a/k/a Boo,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(CR-97-20)

Argued: October 26, 1999

Decided: December 2, 1999

Before WILKINSON, Chief Judge, and
WIDENER and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge King wrote the opinion, in
which Chief Judge Wilkinson and Judge Widener joined.

_____

**COUNSEL**

**ARGUED:** Stephen Douglas Herndon, Wheeling, West Virginia, for
Appellant. Zelda Elizabeth Wesley, Assistant United States Attorney,
Clarksburg, West Virginia, for Appellee. **ON BRIEF:** William D.
Wilmoth, United States Attorney, Clarksburg, West Virginia, for
Appellee.

_____

**OPINION**

KING, Circuit Judge:

Eric Michael Turner appeals from his convictions and sentence in the Northern District of West Virginia for engaging in a continuing criminal enterprise; intentionally killing an individual while engaging in a continuing criminal enterprise; interstate travel in aid of a racketeering enterprise; and using and carrying a firearm during a crime of violence.**1** These charges arose from Turner's operation of a multistate drug trafficking organization and the related murder of Jennifer Folmar, a crack cocaine user who had purchased drugs from Turner's organization and who was rumored to be a government informer. Turner was sentenced on these convictions to life imprisonment plus five years.

On appeal, Turner asserts two errors: first, he claims that his trial was unfairly prejudiced when the district court limited his lawyer's cross-examination of a key prosecution witness about her understanding of penalties she faced before she decided to cooperate; and second, he claims that the district court committed error in his sentencing by applying a two-point adjustment for his role in the offense. As explained below, we find no reversible error and affirm Turner's convictions and sentence.

_____

**1** Turner was convicted by a jury on December 10, 1997, on each of the five counts in the indictment:

> a) Count One -- continuing criminal enterprise, 21 U.S.C. § 848;
>
> b) Count Two -- drug conspiracy, 21 U.S.C.§ 841(a)(1);
>
> c) Count Three -- killing while engaging in a continuing criminal enterprise, 21 U.S.C. § 848(e)(1)(A);
>
> d) Count Four -- interstate travel in aid of racketeering enterprise, 18 U.S.C. § 1952; and
>
> e) Count Five -- using or carrying a firearm during a crime of violence, 18 U.S.C. § 924(c).

Turner's conviction on Count Two was subsequently vacated and dismissed.

2

I.

At the jury trial conducted in December 1997, in Martinsburg, West Virginia, the Government presented evidence from thirty-eight witnesses. The testimony of the prosecution witnesses, other than Denise Grantham (whose testimony is challenged here), established the following:

During 1995 and 1996, Turner and several others distributed crack cocaine to customers in Maryland and West Virginia. They purchased their drugs from contacts in Washington, D.C., New York, and Florida, and they shared the financing, profits, and organizational responsibilities of their drug distribution business. One of their haunts was a "crack house" on a hill on Ray Street, in Shepherdstown, West Virginia. Ms. Folmar, the deceased victim, had purchased drugs from Turner's organization. Turner's jointly tried co-defendant, "PJ" Sellers, regularly sold crack cocaine for Turner and his organization.

On the evening of October 24, 1996, Turner and several other persons were outside the Ray Street crack house. Ms. Folmar arrived in a car, drove up and down Ray Street in front of the house, and attempted to purchase crack. She was told repeatedly to leave the area; indeed, several persons at the crack house were apparently yelling at Folmar, alleging that she was a "cop" or an informant. Folmar became agitated, stated that she was not a snitch, and spun her car's wheels as she left the area. Turner made the statement, "That's hot," as he watched Ms. Folmar leave, meaning that the police would be coming for her. Ms. Folmar then parked her car a short distance down the hill, where it was visible from the crack house.

Someone present said that Julian Pace, who had a bicycle, should go down the hill to find out what Ms. Folmar was doing. Turner placed a handgun in his pocket, hopped on the back of Pace's bicycle, and rode with Pace down the hill towards Ms. Folmar's car. At the time, Turner was wearing a white leather coat, one that he usually wore. Earlier in the day, Turner had placed a plastic surgical glove in his pants' pocket (Turner and others often used surgical gloves when handling their cocaine product). Turner and Pace found Ms. Folmar in her car at the bottom of the hill; she was crying. Turner placed the surgical glove on his right hand and grasped his handgun. The driv-

3

er's window of the car was down, and Turner stood beside the car door and fired twice at Ms. Folmar.

George Johnson, a friend of Ms. Folmar's, was nearby and learned that Folmar's car was a few blocks up the street. He then found Folmar sitting in her car, bloodied and dazed. Her eyes were open and she was breathing heavily, but she did not respond to Johnson. When Johnson saw blood coming from Ms. Folmar's mouth, he opened the door and began wiping the blood away. Several other persons were near the car, including PJ Sellers. Johnson was then grabbed and directed to keep moving before he got in trouble. He immediately left the scene.

Pace and Turner returned from Ms. Folmar's car to the crack house; Turner's hand was bloodied. Turner said,"I got her" and "I got the bitch" and then said that he was just joking. A short while later, Turner asked Sellers if he still had the razor; Sellers said that he did. Turner stated he was going to finish what he had started, and the two men, Turner and Sellers, went down the hill together. About ten to fifteen minutes after the first gunshots were fired, two more gunshots were heard. Turner and Sellers came back up the hill; while doing so Turner made a throwing motion with his hands. The police were right behind them, also coming up the hill. Turner then asked a friend to get the gun that Turner said he had thrown next to a specific house on Ray Street. Turner stated that the gun did not have fingerprints on it.

On arrival at the Ray Street crack house scene, the police found Denise Grantham, Sellers, and Turner on a porch, along with a white leather coat. Turner falsely identified himself to the police using a Muslim name. As the police continued their interviews with others, Turner paid a friend to drive him past the police crime-scene roadblocks, and when the police stopped the car and asked for identification, Turner again used a Muslim name. After the police informed Turner that he would be detained until he provided identification, Turner produced a driver's license that correctly identified him as Eric Turner.

Ms. Folmar was found in her car, suffering from three gunshot wounds and eleven knife wounds. Two of the gunshot wounds were

4

contact wounds above her ear that would have been lethal; the third gunshot wound was a head and neck wound just below her jaw. The stab wounds were made by a single-edge blade that was at least four inches long. Several of the stab wounds were around her right arm and shoulder area, indicating that Ms. Folmar may have attempted to defend herself. Ms. Folmar could have survived most of the stab wounds. Ms. Folmar was in a non-responsive condition when she arrived at the hospital's emergency room, and medical personnel were unable to save her.

The police later found the .25 caliber handgun near the location where Turner had been seen making the throwing motion with his hands. Four empty shell casings were also found, two inside Folmar's car and two outside the car. Three bullets were recovered from Ms. Folmar's body. Both the casings and the bullets were from the .25 handgun. Turner's white leather jacket had a mixture of his and Ms. Folmar's blood inside its right cuff, as well as gunshot residue. Turner's fingerprint was found on the windshield of Ms. Folmar's car.

II.

Turner's first claim on appeal is that the district court improperly limited his lawyer's cross-examination of Grantham, a key prosecution witness, who had been Turner's girlfriend. Turner alleges that he was prevented from effectively undermining Grantham's credibility. He contends he was precluded from showing the jury that Grantham was cooperating with the authorities -- and testifying against him -- because she feared the death penalty if she were prosecuted for involvement in Ms. Folmar's murder.

A.

We first examine the question of whether the limitation placed on the cross-examination of Grantham constituted error. We review a district court's exclusion of evidence for abuse of discretion. See, e.g., United States v. Crockett, 813 F.2d 1310, 1312 (4th Cir. 1987).

It is elementary that trial judges possess wide latitude to impose reasonable limits on cross-examination, based on concerns including

5

harassment, prejudice, confusion of the issues, repetition, or marginal relevance. See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). However, prohibiting a criminal defendant from cross-examining a witness on relevant evidence of bias and motive may violate the Confrontation Clause, if the jury is precluded from hearing evidence from which it could appropriately draw adverse inferences on the witness's credibility. Cf id. at 680.[2]

In this trial, Turner's lawyer sought to cross-examine Grantham about her perceived exposure to criminal liability and penalties for engaging in a continuing criminal enterprise or for a killing resulting from engaging in a continuing criminal enterprise: [3]

> Q: So your choices were to talk with the police or be indicted for continuing criminal enterprise and for murder; is that right?
>
> A: Yes.

_____

[2] " `Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

The partiality of a witness is always relevant as discrediting the witness and affecting the weight of his testimony. See, e.g., Davis v. Alaska, 415 U.S. 308, 316 (1974); United States v. Caudle, 606 F.2d 451, 457 n.3 (4th Cir. 1979) (a "major function" of cross-examination is "to show that the witness is biased, prejudiced, or untrustworthy for any reason."). Exploration of possible biases, prejudices, or ulterior motives of the witness as they relate directly to issues or personalities in the case at hand is a particular means to attack the witness's credibility, and the evidence thus adduced is admissible. See Davis, 415 U.S. at 316-18; Fed. R. Evid. 402 (relevant evidence is generally admissible).

[3] Grantham's knowledge of her indictment risks was also raised on redirect examination, when the Government asked, "[W]hen you went into your plea agreement with the Government, did anyone specifically say that you were going to be charged with a murder?" She replied, "No. I believe it was conspiracy." J.A. 220. Grantham's belief or knowledge of the nature of the suggested conspiracy charge is not in the record.

6

Q: Did you have some idea what the penalties might be at that time?

A: My understanding was --

J.A. 201-02. At this point, the prosecution objected, asserting that the penalties were not relevant. The court sustained the objection, stating that "sentencing on particular charges that are at issue in this case is within the province of the Judge." Id. Grantham thereafter testified that she knew the penalties were "pretty serious."[4]

We conclude that the prosecution's relevancy objection was meritless -- and the Government acknowledged as much at oral argument. Put simply, the crux of the inquiry is the witness's state of mind. A witness's understanding of the potential penalties faced prior to entering into a plea agreement may demonstrate bias and prejudice, as well as the motive of the witness for testifying against the defendant and for the prosecution. As such, this inquiry is, as a general proposition, highly relevant to testing the witness's credibility.[5] See, e.g., United States v. Ambers, 85 F.3d 173, 176-77 (4th Cir. 1996) (approving thorough cross-examination about the maximum and minimum penalties the witness believed he faced, absent his cooperation with the government); United States v. Cropp, 127 F.3d 354, 358 (4th Cir. 1997), cert. denied, 118 S. Ct. 898, 1344 (1998) (noting that the witness's expectations, rather than the actual sentence, were the potential source of bias); Hoover v. Maryland, 714 F.2d 301, 305-06 (4th Cir. 1983) (reversing due to the court's refusal to permit inquiry into a principal witness's subjective understanding of his immunity agreement, and noting that the crux of the inquiry is

_____

[4] Grantham also testified that she pled guilty to federal charges of possession with intent to distribute crack cocaine; had been sentenced to 15 years imprisonment; was currently serving her sentence; and that she was now testifying pursuant to her plea agreement. She said that she hoped the court would reduce her sentence after her cooperation with the Government, and acknowledged she had previously lied about the relevant events.

[5] As a matter of trial strategy, many prosecutors, rather than objecting to the relevancy of such an inquiry, would elicit this evidence on direct examination of a cooperating witness.

7

the witness's state of mind). The Government offered no other grounds for its objection here, and we find the district court's ruling to be erroneous.

Although a trial court may properly exercise its discretion to limit repetitive or otherwise unproductive cross-examination, in this instance the court did not exercise its discretion. Rather, the court based its exclusion of this evidence on an erroneous legal conclusion, by definition an abuse of discretion. See Koon v. United States, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."). Here, the court was concerned with the sentencing in this case, i.e., of Turner or Sellers, rather than the relevant impeachment value of Grantham's testimony concerning her understanding of her sentencing risks. See Cropp, 127 F.3d at 358 ("we do not credit . . . [that allowing the questioning] would impinge upon [the court's sentencing] discretion").

B.

Having found error in the limitation on cross-examination of the witness Grantham, we must carefully examine whether this error was prejudicial to Turner's right to a fair trial and therefore a basis for reversal. Turner asserts that the error is of constitutional dimension, affecting his Sixth Amendment confrontation rights. However, this error was not of constitutional magnitude. Here, the district court permitted substantial and thorough examination of Grantham's biases, as required by the Sixth Amendment.**6**See, e.g., supra, notes 3-4.

When an error is not of constitutional dimension, it is merely a trial error, with a correspondingly lesser threshold for harmlessness. A trial error that does not affect Turner's substantial rights is harmless. See 18 U.S.C. § 3741; Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); see also 28 U.S.C.§ 2111.

_____

**6** Even if the record had established constitutional error, and Grantham understood she risked the death penalty and her cooperation resulted directly therefrom, we conclude that such error would be harmless beyond a reasonable doubt. See Van Arsdall, 475 U.S. at 681.

8

Turner contends that Grantham believed and understood that she risked the death penalty for involvement in Ms. Folmar's killing, and that this understanding resulted in her testifying against Turner. The record, however, is incomplete on what Grantham actually understood regarding her potential sentence had she been prosecuted for the killing of Ms. Folmar. And Turner's trial counsel made no proffer in this regard to the trial court.[7] However, the jury heard that Grantham understood the sentence she faced would have been "pretty serious." We cannot, in these circumstances, conclude that the error affected Turner's substantial rights, or that a more specific response from Grantham would have significantly changed the jury's impression of her credibility. See id. at 680.

The evidence of Turner's guilty involvement in Ms. Folmar's death is simply overwhelming. Indeed, most of the testimony of Grantham is cumulative of evidence given by other witnesses at Turner's trial, with minor embellishments or variations.[8] Although Turner asserts that only Grantham provides the required nexus between the continu-

_____

[7] At oral argument, Government counsel informed the Court that they had not discussed with Grantham the potential penalties associated with her possible prosecution for involvement in the killing of Ms. Folmar.
[8] In summary, Grantham testified to the following: Turner purchased and distributed crack cocaine in 1995 and 1996; he bought the drugs from Washington, D.C. and New York; a number of other people were involved in Turner's drug business; and Turner had a gun and used surgical gloves to cut the cocaine. Turner was the father of her infant daughter. On the night of Ms. Folmar's killing, Grantham saw Ms. Folmar on Ray Street and told her to leave. Ms. Folmar was high on drugs, and people were yelling that she was a snitch. After Ms. Folmar left, Grantham heard two "cap gun" sounds. Turner and Sellers arrived, and Sellers told Turner that "when you sing someone a lullaby, aren't you supposed to put them to sleep." Turner then described how Ms. Folmar was sitting in the car and looking at him. The two then left. Later Turner came back up the hill, wearing his white coat, and washed something inside at the kitchen sink. Turner asked someone to get rid of some surgical gloves for him. The police talked to Grantham, Turner, and Sellers while they were on the porch, and Turner gave them a false name. Afterwards, Turner told Grantham that Ms. Folmar had seen Turner sell cocaine to someone that day; Grantham understood from Turner and Sellers that Turner shot Ms. Folmar and Sellers stabbed her.

9

ing criminal enterprise and the killing of Ms. Folmar, we conclude from the record that the jury could reasonably infer the required nexus from the other available evidence in this case, including: (1) Ms. Folmar's failed attempt on October 24, 1996, to purchase crack cocaine at the crack house that Turner and his associates frequented; and (2) the public labelling of Ms. Folmar as a snitch on October 24, 1996, at the crack house in Shepherdstown. See Glasser v. United States, 315 U.S. 60, 80 (1942) ("The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.").

As a consequence, viewing the record as a whole, we conclude that the district court's limitation on the cross-examination of Grantham did not adversely affect Turner's substantial rights, and was also harmless beyond a reasonable doubt.

III.

Turner also asserts that the district court erred in his sentencing, because the court's application of a two-point increase in his offense level pursuant to the United States Sentencing Guidelines § 3B1.1(c) constitutes impermissible double counting. Turner contends that the associated offense of conviction, Count Three -- intentionally killing and causing the intentional killing of an individual while engaging in a continuing criminal enterprise -- already includes a defendant's supervisory position as an element. Whether the§ 848(e)(1)(A) offense includes a supervisory role as an element is a question of law that we review de novo. We review for clear error the district court's decision to apply an adjustment for Turner's role in the offense. United States v. Harriott, 976 F.2d 198, 202 (4th Cir. 1992).

The district court found a base offense level of 43 for the grouped Counts One, Three, and Four, and then added two levels for Turner's leadership role in the murder of Ms. Folmar.[9] See USSG §§ 2A1.1 (first degree murder); 3B1.1(c) (two-point increase if defendant was an organizer, leader, manager, or supervisor in any criminal activity). The district court found that "§ 3B1.1(c) applies in that defendant was an organizer and leader in the death of Ms. Folmar."

_____

[9] Turner had a Criminal History category of III.

10

Any person who intentionally kills or causes the intentional killing of another person while engaging in or working in furtherance of a continuing criminal enterprise violates 21 U.S.C.§ 848(e)(1)(A). This offense is a substantive crime of violence, and is not a penalty enhancement under the continuing criminal enterprise statute, 21 U.S.C. § 848(a). See United States v. NJB, A Male Juvenile, 104 F.3d 630, 634 (4th Cir. 1997), cert. denied, 520 U.S. 1223 (1997). Although the continuing criminal enterprise offense includes a supervisory role as an element, the § 848(e)(1)(A) offense does not. See 21 U.S.C. 848(c)(2)(A). Because the § 848(e)(1)(A) offense does not include a supervisory role as an element, the district court's application of an adjustment for Turner's role in this offense is neither double counting nor impermissible. We accordingly conclude that the district court did not err by increasing the offense level by two points pursuant to § 3B1.1(c).

IV.

Pursuant to the foregoing, we affirm Turner's convictions and sentence.

AFFIRMED

11