**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-5006**

———————

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JUAN CALDERON,

        Defendant - Appellant.

———————

Appeal from the United States District Court for the District of South Carolina, at Greenville.   J. Michelle Childs, District Judge.  (6:11-cr-00338-JMC-20)

———————

Argued:  December 12, 2013      Decided:  February 7, 2014

———————

Before WILKINSON, KING, and GREGORY, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Russell Warren Mace, III, THE MACE FIRM, Myrtle Beach, South Carolina, for Appellant.   Andrew Burke Moorman, Sr., OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.  **ON BRIEF:** William N. Nettles, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After a four-day trial, a jury found Juan Calderon guilty of one count of conspiracy to possess with intent to distribute marijuana, cocaine, and cocaine base (also known as "crack cocaine"). Calderon now appeals on multiple grounds, alleging that the district court erred in several evidentiary rulings, in dismissing his motion for a judgment of acquittal, and in determining his sentence. For the following reasons, we affirm his conviction and sentence.

I.

A.

In 2004, Justin Jenkins began operating a drug trafficking organization (DTO) in South Carolina dedicated to distributing marijuana, cocaine, and crack cocaine. The DTO obtained marijuana and cocaine, cooked a portion of the cocaine into crack cocaine, and then sold the inventory through a network of local distributors within South Carolina. Members of the DTO included, among others, Kevin Montgomery and Thomas Renrick IV.

Queston Clement, a friend and co-conspirator of Jenkins who lived in California, introduced Jenkins to Cristian Escobedo-Mendoza in 2008. Shortly thereafter, Escobedo began shipping marijuana from California to South Carolina. Later that year, Escobedo introduced Jenkins to Calderon so that Calderon could

continue supplying marijuana to the DTO while Escobedo served a prison sentence. Calderon proceeded to sell marijuana to Jenkins and Clement from September 2008 to January 2009. He delivered the drugs in a variety of ways, one of which was to give packages to Clement, who would then ship them cross country in a pickup truck provided by Jenkins in which Calderon had installed a hidden compartment. In order to pay for the drugs, Jenkins either provided cash payments or had his associates deposit money into various South Carolina bank accounts, including one under the name of Juan Calderon.

In December 2008, Jenkins inquired into whether or not Calderon could procure cocaine, to which Calderon replied affirmatively. Following that discussion, on January 8, 2009, Jenkins flew to California to meet with Calderon and purchase cocaine from him. After his arrival, Jenkins, Calderon, and a third man named Heliodoro Torrez-Sanchez drove to Fresno, where they stayed the night. The next morning Jenkins gave $23,000 to Sanchez for the purpose of buying the cocaine in a Wal-Mart parking lot while Jenkins and Calderon waited at a nearby Carls, Jr. restaurant.

The three conspirators were unaware that Sanchez was the subject of an investigation by the Fresno Police Department (FPD), and that the purported cocaine dealer was, in reality, an undercover FPD detective named Manuel Robles. FPD officers

3

arrested Sanchez immediately after he displayed the money to Detective Robles. They recovered from Sanchez $23,000 and a set of car keys to a Chevy Malibu. Sanchez then directed them to the Carls, Jr. restaurant, where they found both Jenkins and Calderon. The officers ascertained that the car keys in Sanchez's possession were to Calderon's Malibu, and later that day placed both Jenkins and Calderon under arrest. The local district attorney declined to charge Jenkins and Calderon because of insufficient corroborating evidence and they were both released from custody. Jenkins left California, after which he and Calderon did not see each other again until 2011.

Escobedo, upon his release from prison in late 2010, began once again supplying marijuana and cocaine to the DTO. As before, payments for these narcotics occurred at least partly through Calderon's bank account. In January 2011, Jenkins and Renrick traveled to Las Vegas to meet with Escobedo but were surprised to be met at the airport by both Escobedo and Calderon. Calderon drove Jenkins, Renrick, and Escobedo to their hotel and during the drive he declared that the "snitch" from the Fresno drug buy, Sanchez, had been killed.

Calderon was indicted by a federal grand jury later in 2011 in connection with his sale of narcotics to the DTO. While jailed and awaiting trial, Calderon told fellow inmate Stephon Hopkins that Jenkins had "snitched" on him. J.A. 491. Calderon

4

tried to convince Hopkins to have friends outside the jail frighten Jenkins's family to keep him from testifying for the prosecution and stated that if Jenkins did testify, Calderon would have his associates "start killing . . . people." J.A. 495. Calderon also mentioned his plans to intimidate Jenkins to another inmate, Derrick Mosley, and then endeavored to hire Mosley to murder Jenkins. Calderon finally attempted to persuade Demauryo Moody, a third inmate, to sign a false statement undermining Jenkins's credibility.

B.

The indictment charged Jenkins, Calderon, and the other co-conspirators with multiple counts of criminal conduct arising from the operations of the DTO. Calderon was only charged under Count One: conspiracy to possess with intent to distribute five kilograms or more of cocaine, 280 grams or more of crack cocaine, and 1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), all in violation of 21 U.S.C. § 846.

Prior to trial, the government notified Calderon that Jenkins, Renrick, Montgomery, Clement, Escobedo, Hopkins, Mosley, and Moody would all testify against Calderon on behalf of the prosecution. Calderon indicated his desire to inquire into the sentences faced by these cooperating witnesses, and the government subsequently moved in limine to prohibit him from

5

eliciting specific numerical ranges on cross-examination on the grounds that it would unduly prejudice the jury. The district court granted the motion, and restricted Calderon to using "adjectives" instead of specific numbers when examining the cooperating witnesses about their sentencing ranges.

For his part, Calderon moved in limine to exclude evidence of the events surrounding his 2009 arrest in Fresno (the Fresno Incident) as improper character evidence under Federal Rule of Evidence (FRE) 404(b) and as unfairly prejudicial under FRE 403 because it associated him with Jenkins, an admitted high level drug dealer. The district court found that evidence of the Fresno Incident was admissible because it was "intrinsic" to the conspiracy and denied Calderon's motion accordingly.

The government indicated that it would call three officers of the FPD to testify to the events surrounding the Fresno Incident. In response, Calderon moved in limine to exclude any testimony by these officers about statements Sanchez made to them on the basis that the statements were hearsay and admitting them would violate Calderon's rights under the Sixth Amendment's Confrontation Clause. The district court denied Calderon's motion, finding that Sanchez's out-of-court statements were admissible because they were either being offered by the government to show the effect on the FDP's investigation or were admissions by Sanchez as Calderon's co-conspirator.

6

At the conclusion of the government's case-in-chief, Calderon moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on the basis that the evidence was insufficient to sustain a conviction against him for conspiracy to distribute crack cocaine. The district court denied his motion and sent the charge to the jury. Following deliberations, the jury found Calderon guilty and attributed to him personally the liability for 1,000 kilograms or more of marijuana, five kilograms or more of cocaine, and 280 grams or more of cocaine base. Over Calderon's objections, the district court calculated his range under the United States Sentencing Guidelines at between 292 and 365 months and sentenced him to 292 months in prison. Calderon thereafter filed timely notice of this appeal.

## II.

Calderon's initial contention on appeal is that the district court violated his Sixth Amendment right to confront the witnesses against him when it prevented him from cross-examining the government's cooperating witnesses on their numerical sentencing ranges and potential reductions. "We review for abuse of discretion a trial court's limitations on a defendant's cross-examination of a prosecution witness," United States v. Ramos-Cruz, 667 F.3d 487, 500 (4th Cir. 2012)

7

(internal quotation marks omitted), and review de novo the lower "court's legal conclusions regarding constitutional claims," United States v. Dinkins, 691 F.3d 358, 382 (4th Cir. 2012).

The Confrontation Clause in the Sixth Amendment guarantees to every criminal defendant the right to cross-examine the witnesses against him, and thereby "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to [their] reliability." Olden v. Kentucky, 488 U.S. 227, 231 (1988) (internal quotation marks omitted). But this right is not absolute, because "trial judges possess wide latitude to impose reasonable limits on cross-examination, based on concerns including harassment, prejudice, confusion of the issues, repetition, or marginal relevance." United States v. Turner, 198 F.3d 425, 429 (4th Cir. 1999).

In the context of cross-examining cooperating witnesses, the "critical question" is whether the defendant was given the opportunity to reveal the witness's "subjective understanding of his bargain with the government." United States v. Ambers, 85 F.3d 173, 176 (4th Cir. 1996) (internal quotation marks omitted). Consequently, our inquiry on appeal focuses on "whether the jury possesse[d] sufficient evidence to enable it to make a discriminating appraisal of bias and incentives to lie

8

on the part of the witnesses." United States v. Cropp, 127 F.3d 354, 359 (4th Cir. 1997) (internal quotation marks omitted).

In Cropp, we held that a district court did not abuse its discretion when it prohibited a defendant from inquiring into the contrasting numerical sentencing ranges that co-conspirators could have received absent cooperation and hoped to receive with cooperation. Id. at 358-59. We recognized that the credibility of cooperating witnesses in a criminal prosecution is "very relevant." Id. at 358. But we also observed that a trial court might legitimately be concerned that, if the jury learned the severity of the sentences faced by a defendant's co-conspirators, it would conclude he faced the same punishment and "hesitate to find [him] guilty even if the evidence proved [his] guilt." Id. We ruled that the threat of jury nullification trumped the minor marginal value added by permitting inquiry into specific sentencing ranges because, based on the testimony elicited on cross-examination, "the jury was already well aware that the witnesses were cooperators facing severe penalties if they did not provide the government with incriminating information." Id. at 359.

In the case before us, the district court ruled under FRE 403, which provides the trial court the discretion to exclude testimony when its probative value is "substantially outweighed by a danger of . . . unfair prejudice," that Calderon was

permitted to cross-examine each of the cooperating witnesses about their expected prison sentences using "adjectives" but not "numbers." J.A. 68. Calderon maintains the numerical sentencing ranges and potential reductions for assisting the government would facilitate the jury's ability to perform a "discriminating appraisal" of the incentives of the cooperating witnesses to be untruthful and the district court's evidentiary ruling was thus in error. He also claims that Cropp does not apply to the cross-examinations of Hopkins, Mosley, and Moody because they were not Calderon's co-conspirators. Even if Calderon is correct, we need not determine the precise scope or application of our holding in Cropp in this case. For assuming without deciding that any constitutional error occurred, it was unquestionably harmless.

B.

The "Constitution entitles a criminal defendant to a fair trial," but it does not guarantee a "perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). Therefore, "otherwise valid conviction[s] should not be set aside" if we can conclude, "on the whole record, that the constitutional error was harmless beyond a reasonable doubt." United States v. Abu Ali, 528 F.3d 210, 256 (4th Cir. 2008) (internal quotation marks omitted).

As part of its case, the government introduced bank records and the testimony of the arresting officers involved in the

10

Fresno Incident. The government's case also depended in large part on the testimony of co-conspirators and jailhouse informants. In Turner, we found that the district court erred as a matter of law by excluding as not relevant testimony from a witness regarding her understanding of the penalties she would have faced had she not cooperated with the government. 198 F.3d at 430. We observed, though, that the witness admitted she faced a "pretty serious" penalty and that it was impossible to conclude that "a more specific response from [the witness] would have significantly changed the jury's impression of her credibility." Id. at 431. Thus, we held that even if the error was constitutional it was "harmless beyond a reasonable doubt" because the district court permitted a "substantial and thorough examination of [the witness's] biases." Id. at 430-31 & n.6.

The district court afforded Calderon a similar opportunity to conduct a vigorous inquiry into the cooperating witnesses' subjective understandings of their expected prison sentences and he took full advantage of it. The trial court explained that it "did allow the defense to use adjectives, harsh penalty, serious penalties, without indicating a number." J.A. 361. Calderon elicited separately from Clement, Escobedo, and Moody the fact that they were each facing the possibility of serving "a lot of time" incarcerated, J.A. 361-62 (Clement), 457 (Escobedo), 589 (Moody), from Jenkins that he did not want to "spend a long time

11

in jail," J.A. 254, and from Mosley that he might receive a "significant amount of time" locked up, J.A. 566-67. Furthermore, despite the district court's restriction, Renrick admitted on cross-examination that he was "looking at life" in prison, J.A. 416, and Hopkins stated that he "just did two years" and had "five years and ten months" left on his sentence, J.A. 499. Finally, Calderon told the district court that he never intended to call into question the credibility of the eighth cooperating witness, Montgomery.

In addition to these admissions, the record also reveals that the district court permitted a great deal of testimony regarding each of the cooperating witnesses' biases and credibility. All eight testified on direct examination that they had pleaded guilty to various crimes and hoped or expected to gain leniency on their sentences by testifying for the government. Calderon extensively impeached Jenkins, who was the government's key cooperating witness, using his many past instances of untruthfulness. Calderon forced Clement to admit that he had lied to the police, cornered Renrick with his extensive criminal history, and revealed Escobedo's omission of key details in his early debriefings with government agents. He also cross-examined Hopkins, Mosley, and Moody -- the three informants who had interacted with Calderon in jail -- on their many criminal convictions unrelated to the conspiracy in this

12

case and compelled them each to admit they wanted to be released as soon as possible. Calderon meticulously impeached these witnesses and we think the possibility exceedingly small that the admission of their precise sentencing ranges and possible reductions would have "significantly changed the jury's impression of [their] credibility." Turner, 198 F.3d at 431.

Moreover, it cannot be said that the jury did not have some notion of the exact prison sentences Calderon's co-conspirators faced. When Calderon asked Renrick if he was "looking at a lot of time," which is the exact same question Calderon posed to several of the other cooperating witnesses, Renrick testified that he faced a life sentence. J.A. 416. The district court also highlighted the incentives of cooperating witnesses to be untruthful when it carefully instructed the jury prior to its deliberations that when deciding what weight to give their testimony it could consider the fact they were cooperating with and depended on the government for possible sentence reductions. Considering the entire record, we are satisfied that the district court's ruling did not deprive Calderon of a fair trial and that any violation of his Sixth Amendment rights was harmless beyond a reasonable doubt.

Calderon's second and third arguments on appeal rest on his claim that the government failed to offer evidence connecting him to the sale of crack cocaine. He first maintains that the district court erred in denying his motion for a judgment of acquittal because the government did not prove beyond a reasonable doubt that he was involved in the sale of crack cocaine. He argues alternatively that the district court erred in dismissing his motion because the government proved not one conspiracy to distribute marijuana, cocaine, and crack cocaine, but instead two separate conspiracies: one involving marijuana and cocaine and the other, to which he was not connected, involving crack cocaine. We discuss each of these arguments in turn.

"We review de novo the district court's denial of a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure." United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010). Because this is a challenge to the sufficiency of the evidence, "[w]e will sustain the jury verdict" if we find that, "viewing the evidence in the light most favorable to the government, there is substantial evidence to support the conviction." United States v. Hamilton, 699 F.3d 356, 361 (4th Cir. 2012) (internal quotation marks omitted).

14

A.

Calderon asserts that the government, by charging him with conspiracy to distribute marijuana, cocaine, and cocaine base, must prove his connection with each of those substances beyond a reasonable doubt. It is true of course that the government bears the burden of proving to the jury all the elements of the charged offense beyond a reasonable doubt. United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996) (en banc). The elements of the conspiracy charged in this case are that the defendant (1) had an agreement to distribute marijuana, cocaine, and cocaine base, (2) knew of the conspiracy, and (3) knowingly and voluntarily participated in that conspiracy. United States v. Allen, 716 F.3d 98, 103 (4th Cir. 2013). Calderon rests his argument on the "and" linking the drugs in the first element, but we are not persuaded that this conjunction shows that the government failed to meet its burden.

It is clearly established that "one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." Id. (internal quotation marks omitted). The focus of a conspiracy charge is not on the details of the operation, but rather whether there has been an "agreement to violate the law." Id. (internal quotation marks omitted).

It is Calderon's position that the government did not prove his involvement in the conspiracy because while it presented evidence linking him to the sale of marijuana and cocaine, it had no evidence connecting him to the sale of crack cocaine, which was cooked and distributed solely in South Carolina by the DTO. But the record viewed in the light most favorable to the government affords ample reason to reject his claim. Calderon's assumption of Escobedo's drug supply role when Escobedo went to prison, repeated drug sales to Jenkins and Clement, modification of Jenkins's pickup truck with a hidden compartment, receipt of drug payments through his bank account, involvement in the attempted cocaine purchase in Fresno in 2009, declaration that Sanchez was a "snitch" and had been murdered, and attempts once in jail to intimidate and murder Jenkins altogether make for a strong case. Although the government did not offer evidence of Calderon's personal involvement with crack cocaine, it is uncontested that members of the DTO produced and distributed crack cocaine. Calderon's part in advancing the general conspiracy plainly suffices to sustain his conviction, and we decline to disturb the jury's verdict in this regard.

B.

Calderon next claims that the government proved two conspiracies at trial, only one of which implicated him. Because he did not raise this argument in his Rule 29 motion

16

below, we review it for "plain error" under Federal Rule of Criminal Procedure 52(b). United States v. Wallace, 515 F.3d 327, 331-32 (4th Cir. 2008). Under this standard, the defendant bears the burden of demonstrating that (1) an error occurred, (2) it was plain, and (3) it affected his substantial rights. United States v. Rodriquez, 433 F.3d 411, 414-15 (4th Cir. 2006). And even if he can show these three factors, "we have discretion whether to recognize the error, and should not do so unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Dyess, 730 F.3d 354, 361 (4th Cir. 2013) (internal quotation marks omitted).

Calderon's contention relies on the same general proposition discussed above with one exception: in this version of the argument, he maintains that the government's failure to tie him to the crack cocaine shows that there were parallel but dichotomous conspiracies, only one of which involved him. We have recognized that a "single conspiracy exists, when the conspiracy had the same objective, it had the same goal, the same nature, the same geographic spread, the same results, and the same product." United States v. Jeffers, 570 F.3d 557, 567 (4th Cir. 2009) (internal quotation marks omitted). "The mere fact that more than one substance is charged . . . does not mean

17

there are multiple conspiracies." <u>United States v. Barlin</u>, 686 F.2d 81, 89 (2d Cir. 1982).

The testimony and evidence adduced at trial reveals the coherence of the conspiracy at issue in this case. Calderon shared the same objective as his co-conspirators: to make money by shipping and selling prohibited substances in violation of federal drug laws. He provided narcotics to the same individuals who were producing crack cocaine. The conspirators used the same methods to transport the drugs and the same techniques to make and receive payments. They distributed those drugs within the same geographic area of South Carolina. And, until they were apprehended, they enjoyed the same fruits of their unlawful enterprise. We therefore hold that Calderon did not carry his burden of proving that the district court plainly erred in dismissing his Rule 29 motion.

IV.

In his fourth argument, Calderon maintains that the district court erred in permitting the government to offer evidence of his participation in the 2009 Fresno Incident because it was improper character evidence under Federal Rule of Evidence (FRE) 404(b) and unfairly prejudicial under FRE 403. We review a district court's evidentiary rulings for abuse of

18

discretion.  United States v. Lespier, 725 F.3d 437, 447 (4th Cir. 2013).

FRE 404(b) prohibits "[e]vidence of a crime, wrong, or other act" if offered at trial "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  However, not all purported character evidence falls under 404(b)'s proscription.  A prior act that is "intrinsic to the crime charged, and is not admitted solely to demonstrate bad character, . . . is admissible." United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996).  "Other . . . acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged."  United States v. Wilson, 624 F.3d 640, 652 (4th Cir. 2010) (internal quotation marks omitted).

We are unconvinced by Calderon's arguments that the Fresno Incident is not inextricably intertwined with his conspiracy charge.  He maintains that the Fresno Incident is extrinsic because he was never indicted for a crime in connection with his arrest due to a lack of sufficient corroborating evidence. However, the fact that Calderon was never indicted is of no import here because the evidence surrounding the Fresno Incident was undoubtedly relevant to the narrative of the conspiracy and "uncharged acts may be admissible as direct evidence of the

19

conspiracy itself." United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks omitted). It is the elements of the crime, not every single piece of evidence, that the government must prove beyond a reasonable doubt.

The Fresno Incident was undeniably intrinsic to the charged conspiracy. Evidence adduced at trial showed that Jenkins and Calderon collaborated in the attempt to purchase cocaine from what turned out to be an undercover FPD detective. The attempt to buy cocaine arose out of Jenkins's and Calderon's prior dealings buying and selling marijuana and demonstrated a continuation and deepening of their mutual plans to violate federal drug laws for personal gain. The district court did not abuse its discretion in permitting testimony about the Fresno Incident as direct evidence of the conspiracy.

Calderon next calls for this court to overturn the trial court's ruling under FRE 403, which permits a district court to exclude evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice." The preceding discussion of the Fresno Incident's intrinsic connection to the charged conspiracy demonstrates its probative value. But Calderon claims that the jury was prejudiced by the Fresno Incident because it associated him with Jenkins, the admitted leader of the DTO. The jury, he contends, may have desired to punish him for his involvement in the attempt to buy

20

cocaine regardless of whether he was actually guilty of conspiracy. Any slight prejudice arising from these inferences is neither unfair, as FRE 403 requires, and did not substantially outweigh the probative value of the Fresno Incident evidence as a whole. We cannot conclude that the district court abused its direction in admitting it.

V.

Calderon next claims that the district court improperly permitted the FPD officers involved in the Fresno Incident to testify to statements made to them by Sanchez. Calderon alleges the statements were hearsay and their admission violated his right to confront the witnesses against him. We review the district court's rulings involving hearsay for abuse of discretion, United States v. Obi, 239 F.3d 662, 667 (4th Cir. 2001), and its Confrontation Clause rulings de novo, United States v. Abu Ali, 528 F.3d 210, 253 (4th Cir. 2008).

During the trial, the government called Officer Robles, Officer Robert Valdez, and Officer Dean Cardinale of the FPD to describe the events surrounding the Fresno Incident. The officers testified that, among other things, Sanchez told the FPD prior to his arrest that he was interested in purchasing three kilograms of cocaine on behalf of other individuals. Officer Robles also provided the following testimony:

21

Q: After Mr. Sanchez was arrested in the Wal-Mart parking lot, where did you and other officers respond?

A: To the Carls, Jr. restaurant.

Q: Why did you respond to the Carls, Jr. restaurant?

. . . .

A: We responded out there because we had information that a vehicle that was used was at that location with co-conspirators of the drug deal.

Q: Who gave you that information?

A: Mr. Sanchez did.

J.A. 143-44. Calderon maintains that Sanchez's statements were inadmissible hearsay and violated his Confrontation Clause rights. Specifically, he argues that Sanchez's pre-arrest statements were inadmissible because the government never showed that Sanchez was a co-conspirator and his post-arrest statement was inadmissible because it was offered by the government for its truth.

Sanchez's statements prior to his arrest fall under the co-conspirator provision in FRE 801(d)(2)(E). FRE 801(c) generally prohibits witnesses from relaying to the jury out-of-court statements if they are "offer[ed] in evidence to prove the truth of the matter asserted." But statements are not hearsay if "made by the party's coconspirator during and in furtherance of the conspiracy" and are "offered against [the] party." Fed. R. Evid. 801(d)(2)(E). Further, co-conspirator statements are

22

admissible if the government can prove three elements by a preponderance of the evidence: (1) a conspiracy existed in fact, (2) "the declarant and the defendant were members of the conspiracy," and (3) "the statement was made in the course of, and in furtherance, of the conspiracy." United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013).

The government met its burden here. For the first element, there was the trial evidence already recounted proving the existence of a conspiracy. The second element was satisfied by the testimony of Jenkins, as well as Sanchez's own statements to the FPD, that showed both Sanchez's and Calderon's involvement in the attempted cocaine purchase as co-conspirators. Additionally, the car keys recovered from Sanchez's person after his arrest were to Calderon's Chevy Malibu, connecting Calderon directly to Sanchez and the attempted purchase. Renrick also testified that Calderon confirmed Sanchez's participation in the Fresno Incident when informing Jenkins that the "snitch" had been killed. And the third element was established because the statements at issue were clearly "in furtherance of" the crime in that they were made for the purpose of purchasing cocaine, a key objective of the conspiracy.

Sanchez's statement after his arrest to Detective Robles directing the FPD to where Jenkins and Calderon were waiting was also admissible. A statement is not hearsay under FRE 801(c) if

23

it is offered for a purpose other than the truth of the matter asserted, such as "the limited purpose of explaining why a government investigation was undertaken." United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985). Here, Sanchez's statement post-arrest was offered to show why the officers went to the Carls, Jr. restaurant and consequently was elicited simply to show its effect on the FPD's subsequent course of conduct. We thus find that the district court did not abuse its discretion when it admitted these statements.

Calderon's constitutional claim is likewise wanting because the Confrontation Clause applies only to "testimonial" statements. Crawford v. Washington, 541 U.S. 36, 51 (2004). Statements made by co-conspirators in furtherance of a conspiracy are not testimonial in nature, even when made unwittingly to undercover government agents. See id. at 56. Likewise, statements offered for purposes other than to prove the truth of the matter asserted are not considered testimonial. Id. at 59 n.9. Therefore, Sanchez's statements to the FPD are not testimonial and do not run afoul of the Confrontation Clause, and the district court did not err in admitting them.

VI.

Calderon's sixth and final argument is that the district court imposed on him an unreasonable sentence. We review a

24

defendant's sentence to confirm first that the district court committed "no substantial procedural error." United States v. Worley, 685 F.3d 404, 409 (4th Cir. 2012). We apply a clear error standard to the district court's factual findings and a de novo standard to its legal determinations. United States v. McManus, 734 F.3d 315, 317 (4th Cir. 2013). "If no procedural error exists, we review the substantive reasonableness of the sentence imposed for abuse of discretion." United States v. Strieper, 666 F.3d 288, 292 (4th Cir. 2012) (internal quotation marks omitted).

## A.

Calderon claims the district court miscalculated the amount of narcotics attributable to him and thereby erred in determining his sentencing range under the Sentencing Guidelines. First, he contends that because there was no evidence presented at trial tying him to the sale of crack cocaine he should not be held responsible at sentencing for the sale of 280 grams of crack cocaine because it was not "reasonably foreseeable to him." United States v. Williams, 986 F.2d 86, 90 (4th Cir. 1993). Calderon also argues that the district court incorrectly found that he was liable for "2 to 300" pounds of marijuana, J.A. 849, when trial testimony established only his direct sale of "2 to 250" pounds, J.A. 349. Insofar as these drug amounts are not attributable to him,

25

Calderon maintains that his Base Offense Level under the Guidelines should be lower and his sentence correspondingly reduced.

The district court, however, properly determined that it was bound by the jury's verdict attributing to Calderon at least 1,000 kilograms of marijuana, five kilograms of cocaine, and 280 grams of cocaine base. A sentencing court cannot, under its own preponderance standard, upend the jury's findings, particularly when those findings are expressed in no uncertain terms in a verdict. See United States v. Curry, 461 F.3d 452, 460-61 (4th Cir. 2006) (overturning a district court's decision to vary downward from the Guidelines sentencing range because it "contradicted the weight of evidence and the verdict"). As a matter of law, the district court did not err in adopting the drug quantities found by the jury, and therefore it properly calculated his sentencing range under the Guidelines.

B.

We next consider whether the resulting sentence was substantively reasonable, using the presumption on appeal that a sentence under a "properly calculated Guidelines range" is reasonable. Strieper, 666 F.3d at 295 (internal quotation marks omitted). A defendant may overcome this presumption by showing "that the sentence is unreasonable when measured against" the statutory sentencing factors in 18 U.S.C. § 3553(a). United

26

States v. Montes-Pineda, 445 F.3d 375, 379 (4th Cir. 2006) (internal quotation marks omitted).

Calderon advances two § 3553(a) factors as grounds for error: that the district court failed to consider his "history and characteristics," § 3553(a)(1), and also ignored "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6). He notes that his criminal history was less substantial than some of his co-defendants who received lesser sentences. And he highlights the fact that some of his co-conspirators, who pleaded to the same conduct for which he was found guilty, received sentences more lenient than his own.

The sentencing court, however, properly determined his criminal history category. The court below also found it reasonable that his sentence was higher than some of his co-defendants because, unlike Calderon, they had accepted responsibility for their criminal conduct. Moreover, none of his co-conspirators had intimidated witnesses who were to testify against them. The Guidelines sentencing range for Calderon was between 292 and 365 months and the district court exercised its discretion to sentence him to the lower end of this range. We cannot conclude that Calderon's sentence was substantively unreasonable.

27

VII.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED