**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4853**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARCUS DORRELL BYRD,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (5:12-cr-00312-BR-1)

Argued: May 10, 2017                                      Decided: June 26, 2017

Before TRAXLER, FLOYD, and HARRIS, Circuit Judges.

Affirmed by unpublished opinion. Judge Traxler wrote the opinion, in which Judge Floyd and Judge Harris joined. Judge Harris wrote a separate concurring opinion.

**ARGUED:** Eric Joseph Brignac, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Circuit Judge:

Marcus Dorrell Byrd was convicted of multiple drug- and firearm-related charges. Because he had prior drug convictions and the government provided the required notice, Byrd was sentenced to a statutorily mandated sentence of life imprisonment. *See* 21 U.S.C. §§ 841(b)(1)(A), 851(a). Byrd appeals, raising various challenges to his convictions and sentence. Finding no reversible error, we affirm.

I.

Robin Applewhite was arrested on drug charges while he was serving a term of federal supervised release. In an attempt to reduce his sentence, Applewhite began working as a confidential informant for the police in Fayetteville, North Carolina. Applewhite identified Byrd as a large-scale cocaine distributor, and he conducted two controlled purchases of cocaine from Byrd under police supervision. The controlled buys took place on June 1 and 8, 2011; Applewhite purchased two ounces of cocaine on both occasions. Police surveillance teams observed and photographed the transactions from a distance, and Applewhite provided audio of the transactions through a hidden recording device the police had given him.

On June 24, 2011, Fayetteville police conducted a warrant-based search of the apartment where Byrd lived with his girlfriend. In the master bedroom, police discovered more than $15,000 in cash packaged in $1,000 bundles, a digital scale, and a cocaine press. A loaded, semi-automatic handgun was found under Byrd's side of the bed. In the kitchen, police found a cabinet containing several boxes of plastic baggies, baking powder, baking soda, and razor blades, all of which are used in processing cocaine for

3

sale. The digital scale, cocaine press, and razor blade all tested positive for cocaine residue, but police did not recover any cocaine from the apartment.

Byrd was charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; possession of a firearm in furtherance of that conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A); two counts of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

The government's evidence at trial included testimony from the police officers involved with Applewhite's controlled buys, as well as testimony from Applewhite himself and from Marcus Moore, who supplied cocaine to Byrd until a few months before the controlled buys took place. The government also introduced statements Byrd made to the police after he was arrested, photographs and video recordings of the observable portions of the buys, and audio recordings of the actual transactions between Applewhite and Byrd. At the time of trial, the parties believed that Applewhite was facing multiple drug-related charges in state court, as well as state charges for human trafficking and first-degree kidnapping.[1] The district court permitted Byrd to elicit testimony that Applewhite was facing felony charges, but the court granted the

---

[1] After the briefing was complete in this case, the government discovered that many of the state charges believed to be pending against Applewhite at the time of Byrd's trial had in fact been dismissed before the trial. Among the charges dismissed were the human-trafficking and kidnapping charges.

4

government's motion in limine and precluded Byrd from inquiring into the specifics of the charges.

The jury convicted Byrd of all counts. At sentencing, the district court determined that Byrd qualified as an armed career criminal because his prior conviction for instigating a prison riot counted as a "violent felony" under the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). The ACCA designation ultimately did not affect Byrd's sentence, however, as the conspiracy conviction carried a mandatory sentence of life imprisonment because Byrd had two prior convictions for "felony drug offenses." 21 U.S.C. § 841(a)(1); *see* 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."). The district court therefore sentenced Byrd to life imprisonment on the conspiracy count, a consecutive 25 years on the § 924(c) count, and concurrent sentences on the other counts. This appeal followed.

II.

Byrd first challenges the sufficiency of the evidence supporting his § 924(c) conviction. "On an appeal challenging the sufficiency of evidence, we assess the evidence in the light most favorable to the government, and the jury's verdict must stand unless we determine that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013). "In evaluating the sufficiency of the evidence, we do not review the credibility of the witnesses and assume that the jury resolved all contradictions in the

5

testimony in favor of the government." *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007).

The indictment alleged that on June 24, 2011 – the day the apartment was searched and the gun seized – Byrd possessed a gun in furtherance of the conspiracy alleged in Count One of the indictment. Byrd contends that the government failed to present sufficient evidence to connect his possession of the gun to the Count One conspiracy. Byrd's argument is premised on two pieces of evidence: After the search, Byrd told police that he had just bought the gun the day before; and Marcus Moore, one of Byrd's suppliers, testified that he quit providing drugs to Byrd in March 2011. Byrd thus argues that the Count One conspiracy ended in March 2011 and that he could not have possessed the gun in furtherance of *that* conspiracy because he didn't even own the gun until after the conspiracy ended. We disagree.

The Count One conspiracy charge was not limited to Byrd's involvement with Moore. The indictment does not name Moore, but instead alleges the existence of a conspiracy that continued at least until June 24, 2011, and involved Byrd "together with others both known and unknown to the Grand Jury." J.A. 13. The government's evidence was sufficient to permit a reasonable jury to conclude that Byrd was part of a conspiracy with unknown individuals until the date of his arrest.

Moore testified that he provided Byrd with two kilograms of cocaine per month until March 2011 and that Byrd began purchasing cocaine from "[s]omebody in Lumberton, North Carolina" thereafter. J.A. 306. And after he was arrested, Byrd admitted to Detective Thompkins that he had been selling half an ounce of cocaine per

week for the previous nine months, and he identified other dealers in his supply chain. This evidence, along with Byrd's continued ability to provide cocaine even after the end of his relationship with Moore, shows that he had another supplier, which in turn establishes Byrd's continued participation in a drug-distribution conspiracy at the time of his arrest. Given the presence in the apartment of bundles of cash and paraphernalia of the commercial drug trade and Byrd's own statement to the police that he had the gun for protection, a reasonable jury could easily conclude beyond a reasonable doubt that Byrd possessed the gun in furtherance of the Count One drug-distribution conspiracy. *See United States v. Moore*, 769 F.3d 264, 270 (4th Cir. 2014) ("Some of the ways a firearm might further, advance, or help forward a drug trafficking crime[, as required by § 924(c)], include defending the dealer's drugs, drug profits, or his person." (internal quotation marks and alterations omitted)). We therefore reject Byrd's challenge to his § 924(c) conviction.

## III.

Byrd contends that the district court erred by preventing Byrd from eliciting testimony about the nature of the state charges pending against Applewhite.[2] Byrd argues that if the jury had known about the nature and seriousness of the offenses, it might have found that Applewhite "lacked basic credibility" or concluded that Applewhite was tailoring his testimony "in a manner pleasing to the government." Brief

---

[2] As noted, many of the charges had already been dismissed by the time of Byrd's trial. Because it does not affect our analysis, we will consider this issue under the facts as understood by the parties and the district court at the time of trial.

of Appellant at 25. In Byrd's view, the jury might have found that the government's willingness to work with a human trafficker called into question "the credibility of the entire prosecution." *Id.*

"We review for abuse of discretion a trial court's limitations on a defendant's cross-examination of a prosecution witness." *United States v. Smith*, 451 F.3d 209, 220 (4th Cir. 2006). "It is elementary that trial judges possess wide latitude to impose reasonable limits on cross-examination, based on concerns including harassment, prejudice, confusion of the issues, repetition, or marginal relevance." *United States v. Turner*, 198 F.3d 425, 429 (4th Cir. 1999). "However, prohibiting a criminal defendant from cross-examining a witness on relevant evidence of bias and motive may violate the Confrontation Clause, if the jury is precluded from hearing evidence from which it could appropriately draw adverse inferences on the witness's credibility." *Id.*

We will assume for purposes of this appeal that the district court committed constitutional error by limiting Byrd's cross-examination of Applewhite. Nonetheless, we are satisfied that the error in this case was harmless. *See Smith*, 451 F.3d at 222 (concluding that improper restriction of cross-examination was harmless).

When determining whether the improper denial of a defendant's opportunity to impeach a witness requires a new trial, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

8

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id*.; *see Smith*, 451 F.3d at 222. Even if the jury had been informed that Applewhite was facing charges of human trafficking and kidnapping, that information would not have led a reasonable jury to reject Applewhite's testimony.

First, Byrd's cross-examination of Applewhite already provided the jury with ample reason to doubt Applewhite's credibility. The jury knew of Applewhite's criminal history and that he sold cocaine while on federal supervised release after serving a five-year sentence on a gun charge. The jury knew that Applewhite *in this case* was cooperating with law enforcement in the hopes of reducing his sentence, and the jury knew that the police had paid Applewhite thousands of dollars for his services as a confidential informant in other cases. This evidence alone provided an ample basis for the jury to conclude that Applewhite might be biased or inclined to tailor his testimony to favor the government. To the extent that knowledge of the specific nature of the pending charges would have been relevant, it was cumulative to an already-strong body of evidence questioning Applewhite's bias and his interest in tailoring his testimony.

Second, Applewhite's testimony was corroborated in all material respects by compelling independent evidence. Detective Thompkins testified that Applewhite contacted Byrd, in Thompkins' presence, to set up each controlled buy; that police searched Applewhite before each buy and provided him with money and a concealable

9

audio-recording device; that the recording device transmitted the conversations between Applewhite and Byrd to the police as they occurred; and that Applewhite turned over the cocaine and recording device when the police approached him after the transactions were complete. The jury saw still photographs and video recordings of Applewhite approaching the meeting points, and it heard the audio recordings of the conversations between Applewhite and Byrd. Applewhite testified to these very points, and the evidence described above corroborated his testimony in all material respects.

Under these circumstances, we believe any error in limiting the cross-examination of Applewhite was harmless beyond a reasonable doubt. The government's evidence was very strong, and the jury returned a guilty verdict despite already having ample reason to question Applewhite's credibility. We see no reasonable basis to conclude that a jury would have given any less weight to Applewhite's testimony, which was corroborated by other compelling evidence, if it had been given full information about the nature of Applewhite's charges. Because we conclude that the district court's error "did not contribute to the verdict obtained," *United States v. Williams*, 632 F.3d 129, 133 (4th Cir. 2011) (internal quotation marks omitted), we affirm Byrd's convictions.

IV.

Finally, Byrd challenges his classification as an armed career criminal. Because Byrd raises this issue for the first time on appeal, we review the district court's determination for plain error only. *United States v. Aplicano-Oyuela*, 792 F.3d 416, 422 (4th Cir. 2015). "To satisfy plain error review, the defendant must establish that: (1)

10

there is a sentencing error; (2) the error is plain; and (3) the error affects his substantial rights." *Id.*

Byrd argues, and the Government concedes, that under *Johnson v. United States*, 135 S. Ct. 2551 (2015), his prior conviction arising from his role in a prison riot no longer qualifies as a violent felony under the ACCA. However, as previously noted, Byrd was subject to a mandatory sentence of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). The mandatory minimum sentence under the ACCA, which was imposed to run concurrently to his life sentence for the drug conspiracy, thus did not alter Byrd's actual sentence. Because the error did not extend Byrd's sentence, the error does not affect Byrd's substantial rights. *See, e.g.*, *United States v. McDonald*, 850 F.3d 640, 645 (4th Cir. 2017) (under plain-error review, declining to vacate presumed-erroneous ACCA designation because the district court made clear that it would have imposed the same sentence even without the ACCA designation); *United States v. Ellis*, 326 F.3d 593, 600 (4th Cir. 2003) (under plain-error review, declining to correct 30-year sentence that exceeded the applicable statutory maximum because, "in light of Ellis' life sentence on Count One and concurrent 30–year term on Count Two, the error did not affect his substantial rights"). Byrd's arguments about the effect an erroneous ACCA designation may have on his ability to benefit from future executive clemency or statutory amendments have no support in the record and are far too speculative to carry his burden of showing that his substantial rights have been affected.

V.

Accordingly, for the foregoing reasons, we hereby affirm Byrd's convictions and sentence.[3]

AFFIRMED

---

[3] Byrd acknowledges that his argument that the district court erred by basing Byrd's sentence on his prior convictions is foreclosed by the Supreme Court's decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). "*Almendarez-Torres* remains good law, and we may not disregard it unless and until the Supreme Court holds to the contrary." *United States v. McDowell*, 745 F.3d 115, 124 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 942 (2015).

PAMELA HARRIS, Circuit Judge, concurring:

I concur in the court's opinion, and write separately only to note my dismay that we find ourselves unable to correct the judgment under which Byrd will serve a life sentence. All agree that the judgment, entered before the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), is now manifestly contrary to law, improperly designating Byrd as a career offender under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), and imposing a corresponding 15-year minimum sentence. But because Byrd did not enter a *Johnson* objection at his pre-*Johnson* sentencing, we are constrained by the plain error standard of review and our precedent to leave that error in place.

To put a person in prison for life is a grave and serious undertaking. *See Graham v. Florida*, 560 U.S. 48, 74 (2010) (describing life imprisonment as an "irrevocable judgment about [the defendant's] value and place in society"). It should not be too much to ask of the criminal justice system that we do it correctly. It would be a simple enough matter for the district court to amend Byrd's judgment so that it conforms to law, and the government has offered no compelling justification for opposing Byrd's efforts to correct his sentence. I regret that we have been left with no choice but to affirm this manifestly erroneous judgment.